640 A.2d 1374

**Randall J. SIPE, Petitioner,**

**v.**

**Robert A. SNYDER, in his official capacity as Comptroller for the Pennsylvania Department of Public Welfare, and Department of Public Welfare of the Commonwealth of Pennsylvania, Respondents.**

Commonwealth Court of Pennsylvania.

Submitted Feb. 8, 1994.

Decided April 6, 1994.

Charles O. Barto, Jr., for petitioner.

James S. Marshall, Asst. Counsel, for respondents.

Before CRAIG, President Judge, and DOYLE, COLINS, McGINLEY, SMITH, PELLEGRINI and KELLEY, JJ.

CRAIG, President Judge.

Petitioner Randall Sipe has appealed from a decision of the Department of Public Welfare (DPW) denying his request under the Right-to-Know Act[1] that he be allowed to examine and copy "Settlement and Appeal Activity Reports" as to nursing homes for the period of July, 1989 through June, 1992. In refusing, DPW's chief counsel contended that such reports are not "public records" under the Act. Pursuant to Sipe's request for reconsideration of that denial, DPW stated that the reports are not public records because they are "monthly summaries of information compiled for management monitoring and budgeting purposes."

When the case reached argument before the court, the insufficiency of the record, consisting only of correspondence

1. The title commonly used to describe the Act of June 21, 1957, P.L. 390, *as amended*, 65 P.S. §§ 66.1–66.4.

in which each party presented differing characterizations and descriptions of the documents involved, became apparent. Although, under the Act, DPW has no duty to conduct an administrative agency hearing, and neither DPW nor an applicant has any power or right to insist upon an administrative agency hearing before judicial relief is sought under the Act, the unique need in this case for information, concerning the requested records, forced this court to exercise its discretion to remand the case for an administrative hearing to make a factual record as to Sipe's claim that the desired documents constituted accounts dealing with the disbursement of funds, covered by the Act, and DPW's characterization that they are secondary records, drawn up from actual accounting records of disbursements and assembled solely to plan and manage departmental operations.

Pursuant to that remand order, DPW did conduct the necessary hearing, and the court now has the benefit of the transcribed testimony of department officials, together with descriptions of the records sought to be obtained and exhibits constituting examples of those records.

## QUESTION INVOLVED

Because § 3 of the Act, 65 P.S. § 66.3, states that "[a]ny citizen of the Commonwealth ... shall have the right to ... make copies of public records....," the general question of law in this case is whether a Settlement and Appeal Activity Report constitutes a "Public Record" under the Act's definition of that term, which states in § 1(2):

> (2) 'Public Record.' Any account, voucher or contract dealing with the receipt or disbursement of funds by an agency or its acquisition, use or disposal of services or of supplies, materials, equipment or other property and any minute, order or decision by an agency fixing the personal or property rights, privileges, immunities, duties or obligations of any person or group of persons....

65 P.S. 66.1(2).

Sipe makes no claim which would characterize the requested Reports as a "voucher" or "contract" under the statutory

definition. Moreover, DPW does not rely upon any of the exceptions to the definition, which bar public access to documents disclosing investigations, operating to the impairment of reputation or personal security, or subjecting a public agency to loss of federal funds.

Accordingly, the central issue can be briefly stated with accuracy: Does a Settlement and Appeal Activity Report come within the Act's definition of a public record subject to disclosure to the citizenry by virtue of being an "account ... dealing with the receipt or disbursement of funds by an agency...."?

## FACTS

One helpful result of the agency hearing upon remand has been to provide this court with an example of a "Settlement and Appeal Activity Report" relating to nursing homes. There follows an exemplar of such a report, for June, 1992, one of the months requested, consisting of parts of DPW Exh. 2, as follows:

1. The title page
2. Key to codes
3. Detail of settlement & appeal activity (one of four pages)
4. Summary of payments and collections (two pages).

## DPW COMPTROLLER OFFICE

## SETTLEMENT AND APPEAL ACTIVITY REPORT

## JUNE, 1992

## KEY TO CODES
## SETTLEMENT APPEAL & ACTIVITY REPORTS

### PROVIDER TYPE TABLE

| | |
|---|---|
| 11 | General Hospital |
| 12 | Rehabilitation Hospital |
| 13 | Private Psychiatric Hospital |
| 24 | Contracts |
| 25 | Private ICF-MR |
| 26 | Rural Health Center |
| 35 | County Nursing Home |
| 36 | Private Nursing Home |

### AUDIT/APPEAL CODES TABLE

| | |
|---|---|
| AS | Audit Settlement |
| ARA | Audit Report Appeal |
| IAS | Interim Audit Settlement |
| IRA | Interim Rate Appeal |
| IRS | Interim Rate Stipulation |
| ARS | Audit Report Stipulation |
| DRS | DRG Rate Stipulation |
| DRA | DRG Rate Appeal |
| DCS | Denied Claim Stipulation |
| DCA | Denial Claim Appeal |

### ACTION CODES TABLE

| | |
|---|---|
| N | New Report Logged In - No Action |
| P | Payment to Provider |
| C | Collected from Provider (Gross Adj.) |
| CR | Check Received from Provider |
| EFC | Estimated Future Collections |
| REFC | Reduction to Estimated Future Collections |
| AP | Payment to Provider - Adjustment |
| AC | Collected from Provider - Adjustment |
| ACR | Check Received from Provider - Adjustment |
| AEFC | Estimated Future collections - Adjustment |

DPW Comptroller Office
Detail of Settlement & Appeal Activity
For the Month Ended 06/30/92

Provider Type 36 - Private Nursing Home

| Date of Letter/Action | Provider Contract No. | Provider Name | Service Period Ending | Audit/Appeal Code | Action Code | Amount |
|---|---|---|---|---|---|---|
| 06/17/92 | 00960513 | SILVERSTREAM OF PA | 06/30/91 | IAS | P | 16,260.53 |
| 06/11/92 | 00748568 | SIMPSON HOUSE OF UMC | 12/31/87 | ARS | P | 17,336.52 |
| 06/11/92 | 00748568 | SIMPSON HOUSE OF UMC | 12/31/88 | ARS | P | 24,754.87 |
| 06/03/92 | 01110268 | SPRINGS MANOR CARE CTR | 06/30/89 | IAS | P | 55,773.04 |
| 06/01/92 | 00755295 | ST ANNE HM FOR ELDERLY | 06/30/90 | AS | P | 68,491.22 |
| 06/09/92 | 00749396 | ST ANNE'S HOME FOR AGED | 06/30/90 | AS | EFC | 1,303.96 |
| 06/18/92 | 00749396 | ST ANNE'S HOME FOR AGED | 06/30/90 | AS | CR | 1,303.96 |
| 07/01/92 | 00751269 | ST JOHN NEUMAN NURS HM | 06/30/90 | AS | P | 176.63 |
| 06/11/92 | 00749940 | ST JOSEPH HM FOR AGED | 06/30/90 | AS | P | 81,116.70 |
| 06/11/92 | 00937108 | ST JOSEPH N & HLTH CR | 06/30/91 | AS | P | 1,230.75 |
| 06/17/92 | 00751349 | ST JOSEPH'S MANOR | 06/30/90 | AS | CR | 13,776.86 |
| 06/09/92 | 01035539 | STAPELEY IN GERMANTOWN | 06/30/91 | IAS | P | 236,113.81 |
| 06/16/92 | 01035539 | STAPELEY IN GERMANTOWN | 05/30/90 | AS | P | 141,028.43 |
| 06/09/92 | 00749387 | SUNBURY COMM HOSP SNF | 06/30/90 | AS | P | 16,643.59 |
| 06/10/92 | 01110259 | SUNSET MANOR | 06/30/91 | IAS | P | 83,707.86 |
| 06/03/92 | 00887712 | TAYLOR NURS & REHAB CTR | 06/30/91 | IAS | P | 239,025.31 |
| 06/16/92 | 00887712 | TAYLOR NURS & REHAB CTR | 06/30/90 | AS | P | 62,400.02 |
| 06/10/92 | 00860245 | TREMONT NURSING CENTER | 06/30/91 | IAS | P | 122,919.94 |
| 06/01/92 | 00754690 | TUCKER HOUSE | 11/20/89 | AS | EFC | 21,788.01 |
| 06/16/92 | 01184557 | TUCKER HOUSE | 06/30/90 | AS | EFC | 248,043.76 |
| 06/09/92 | 01216795 | VALENCIA WOOD NURSG CTR | 06/30/91 | IAS | CR | 121,803.89 |
| 06/17/92 | 00755965 | VILLA TERESA | 12/31/89 | AS | CR | 2,425.54 |
| 07/01/92 | 00756971 | VINCENTIAN HM CHRON ILL | 06/30/90 | AS | EFC | 56,836.08 |
| 06/09/92 | 01027241 | WIGHTMAN CTR NSG & REHA | 06/30/90 | AS | C | 48,251.75 |
| 06/17/92 | 01027241 | WIGHTMAN CTR NSG & REHA | 06/30/90 | AS | C | 48,251.75 |
| 06/19/92 | 01027241 | WIGHTMAN CTR NSG & REHA | 09/25/90 | AS | EFC | 139.50 |
| 06/09/92 | 01178200 | WOODHAVEN CARE CENTER | 06/30/91 | IAS | P | 7,781.61 |
| 07/01/92 | 01001236 | WOODLAND RETIREMENT CTR | 12/31/90 | AS | EFC | 34,832.25 |
| 05/01/92 | 00757208 | WORKMAN'S CIRCLE | 06/30/90 | AS | EFC | 18,190.07 |
| 06/01/92 | 00757208 | WORKMAN'S CIRCLE | 09/15/91 | AS | EFC | 19,860.75 |
| 06/11/92 | 00756523 | WYNCOTE CHURCH HOME | 06/30/90 | AS | P | 828.00 |
| 06/09/92 | 00756407 | ZERBE SISTERS NURS CTR | 06/30/91 | IAS | P | 25,046.86 |

**RFW Comptroller Office**
Detail of Settlement & Appeal Activity
for the Month Ended 06/30/92

Provider Type 36 - Private Nursing Home

| Date of Letter/Action | Provider Contract No. | Provider Name | Service Period Ending | Audit/Appeal Code | Action Code | Amount |
|---|---|---|---|---|---|---|

SUMMARY
PAYMENTS AND COLLECTIONS

PAYMENTS

| Source | Current Month | Year to Date |
|---|---|---|
| Audit | 5,502,841.01 | 80,591,760.35 |
| Appeal | 368,113.43 | 8,576,860.55 |
| Total | 5,870,954.44 | 89,168,620.90 |

COLLECTIONS

| Method | Current Month | Year to Date |
|---|---|---|
| Check | 167,659.49 | 299,798.38 |
| Gross Adj | 306,664.90 | 2,972,062.24 |
| Total | 474,324.39 | 3,271,860.62 |

DPW Comptroller Office
Summary of Settlement & Appeal Activity
For the Month Ended 06/30/92

| Provider Type | Payments | | | Gross Adj | Collected | | Total | |
|---|---|---|---|---|---|---|---|---|
| | Audits | Appeals | Total | | Check | | Total | |
| 11 | 271,298.20 | 0.00 | 271,298.20 | 1,665,587.70 | 416,938.92 | | 2,082,526.62 | 06/92 |
| | 3,108,663.62 | 1,437,863.56 | 4,516,527.18 | 12,594,027.06 | 7,060,146.97 | | 20,054,174.03 | YTD |
| 12 | 51,457.70 | 0.00 | 51,457.70 | 0.00 | 0.00 | | 0.00 | 06/92 |
| | 694,963.34 | 7,887,942.41 | 8,582,905.75 | 272,140.22 | 744,081.23 | | 1,016,221.45 | YTD |
| 13 | 191,721.46 | 0.00 | 191,721.46 | 233,030.74 | 64,124.07 | | 297,154.81 | 06/92 |
| | 5,269,017.74 | 3,898.48 | 5,272,916.22 | 1,146,161.03 | 1,071,341.28 | | 2,217,505.31 | YTD |
| 24 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | 0.00 | 06/92 |
| | 0.00 | 0.00 | 0.00 | 443.28 | 24,146.27 | | 24,589.55 | YTD |
| 25 | 652,176.94 | 1,285,940.10 | 1,938,117.04 | 28,323.83 | 128,686.41 | | 157,010.24 | 06/92 |
| | 2,070,800.35 | 6,061,047.54 | 8,131,847.89 | 1,051,545.91 | 288,416.13 | | 1,739,962.04 | YTD |
| 26 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | 0.00 | 06/92 |
| | 148,447.02 | 0.00 | 148,447.02 | 5,601.70 | 0.00 | | 5,601.70 | YTD |
| 35 | 0.00 | 537,038.19 | 537,038.19 | 0.00 | 0.00 | | 0.00 | 06/92 |
| | 26,760,685.01 | 3,001,640.76 | 29,762,325.77 | 0.00 | 0.00 | | 0.00 | YTD |
| 36 | 5,502,841.01 | 368,113.43 | 5,870,954.44 | 306,664.90 | 167,659.49 | | 474,324.39 | 06/92 |
| | 80,591,760.35 | 8,576,860.55 | 89,168,620.90 | 2,972,062.24 | 299,798.38 | | 3,271,860.62 | YTD |
| TOTALS | 6,669,495.31 | 2,191,091.72 | 8,860,587.03 | 2,233,607.17 | 777,408.89 | | 3,011,016.06 | 06/92 |
| | 118,644,337.43 | 26,969,253.30 | 145,613,590.73 | 18,441,984.44 | 9,887,930.26 | | 28,329,914.70 | YTD |

In the hearing, the testimony of DPW's Assistant Comptroller was as follows:

Cost settlement is a reconciliation of the amount of money owed to a medical assistance provider based upon an analysis of audited costs compared to an amount of money that has

been paid to the facility on an interim basis during a given period of time. (T 23) The department implements cost settlement after it receives an audited cost report from the agency in charge of preparing audits. Where an underpayment has been made, DPW advises the facility that it is owed a specified amount of money. DPW sends a letter with a worksheet that documents the reconciliation process between audited costs and interim payments. (T 26) Where an overpayment has occurred, DPW notifies the facility by letter of the overpayment and of the department's demand for it. (T 26)

The department regards the letter and worksheet as the documentation which DPW enters into the Medical Assistance Management Information System as a debit in the case of an overpayment, or a credit in the case of an underpayment. (T 26, 27) After the entry of such debit or credit, the department makes appropriate payment or initiates collection of the amount owed. (T 27)

The Settlement and Appeal Activity Reports are generated monthly as summaries of payment activities related to medical assistance providers. (T 29) The reports are prepared after the transactions have been completed. (T 36–37) The office of the assistant comptroller sends the reports to the Deputy Secretary for Medical Assistance, the Deputy Secretary of Administration and the Deputy Secretary for Mental Retardation, and also retains copies as summaries of monthly activities. (T 38)

To the Medical Assistance Section, the significance of the reports is that they reflect trends of payments and levels of payment activities. (T 80) That office uses the reports to obtain estimates on how much money long-term pooling agreements and inter-governmental transfers will cost the department. (T 81, 82) The Reports support budgetary estimates of the amount of funding from inter-governmental transfers that will be used for current cost settlements. (T 82)

Departmental budget officials and the Division Director of the Office of Medical Assistance Programs also testified. The

Office of Medical Assistance Programs sets interim rates for nursing homes that participate in the Medical Assistance Program. The Reports have no real significance to that division but are used only to gage productivity during the course of each month.

## ANALYSIS

The testimony concerning the Reports, and examination of the Reports themselves, makes clear that they unquestionably are documents "dealing with the receipt or disbursement of funds by an agency," in that they deal with the disbursement of funds to providers entitled to a credit, and with the receipt of funds from providers who owe a repayment to the department.

Thus the pivotal issue comes down to whether or not a Report constitutes an "account." The differing views are illuminated by examination of the various definitions of the noun "account" given in Webster's Third New International Dictionary, Unabridged (1986). No-one argues for the general narrative sense of "account" as meaning "**9a:** a statement of facts or events" or "b: an informative report or descriptive narration." Instead, there is agreement that the question here relates to "account" in the accounting sense, and the dictionary, with respect to that use of the word "account" in the singular, lists the following:

**2a:** a record of debit and credit entries chronologically posted to a ledger page from books of original entry to cover transactions involving a particular item (as cash or notes receivable) or a particular person or concern

**b:** a statement of transactions during a fiscal period showing the resulting balance

. . . .

**5a:** a periodically rendered reckoning (as one listing charge purchases and credits). . . .

DPW here seeks to shield its Settlement and Appeal Activity Reports from public view principally by contending that they do not constitute the *individual original* accounting

entries generating a debit or a credit; they are not journal entries in the accounting sense of a listing of original credits and debits during a time period, such as a day, nor are they ledger entries, comprised of those debits and credits which relate to a particular entity, posted to the ledger of fiscal relationships with that particular person or entity.

On the other hand, Sipe's argument amounts to a claim that the Reports do consist of "a statement of transactions during a fiscal period showing the resulting balance" and that they are "a periodically rendered reckoning (as one listing charges and credits) . . . ."

Examination of DPW Exh. 2, set forth above, shows that it does *not* constitute *original* entries of debits and credits in the context of a journal or ledger. On the other hand, it clearly represents, for a number of persons with whom DPW deals, a statement of transactions during a fiscal period resulting in a balance due or payable and is a reckoning compiled periodically.

DPW contends that the individual letter or worksheet for each provider constitutes the only account in the sense used by the Act, and that such letter and worksheet amount to the only periodically rendered reckoning communicated to a particular provider.

Therefore, if Sipe had requested DPW to allow copying of all of the many individual letters and worksheets compiled by DPW for all nursing home providers throughout the period from July 1989 through June 1992, that request would have to be honored under the Act, according to DPW's position confining the concept of public records to such individual provider documents. Of course, the logistics involved, with respect to the citizen making the request and DPW, would obviously be enormous under such a narrowed concept. DPW, in order to inform its respective offices and divisions concerning the dollar impact of the reconciliation of debits and credits to providers over a period, does not bundle up the entire mass of letters and worksheets to communicate with its divisions, so that it would be sending two or more documents for each of

hundreds of providers. Instead, DPW simply sends compilations of that accounting. And the requested Reports constitute those compilations.

The judicial interpretation of the Right-to-Know Act has not confined the concept of "account" only to original debit and credit entries.

Listings and compilations of fiscal data have been treated as public records, such as the list of uncashed checks in *Anders v. Department of Treasury,* 137 Pa.Commonwealth Ct. 111, 585 A.2d 568 (1991). This court has construed "account" to include any "record of business dealings between the parties" as well as the "documentary record of a business transaction." *Carbondale Township v. Murray,* 64 Pa.Commonwealth Ct. 465, 440 A.2d 1273 (1982).

This court has never limited the concept of public records solely to records dealing singularly with an individual. *Young v. Armstrong School District,* 21 Pa.Commonwealth Ct. 203, 344 A.2d 738 (1975), held that a list of names of school children was a public record. A list of bidders submitting proposals was a public record in *Vartan v. Department of General Services,* 121 Pa.Commonwealth Ct. 470, 550 A.2d 1375 (1988). A list of persons who have taken an examination is a public record under *Friedman v. Fumo,* 9 Pa.Commonwealth Ct. 609, 309 A.2d 75 (1973). Attendance records of school employees are public records, *Kanzelmeyer v. Eger,* 16 Pa.Commonwealth Ct. 495, 329 A.2d 307 (1974). A list of subscribers to a public periodical concerning wild game was treated as a public record under the Act, *Hoffman v. Pennsylvania Game Commission,* 71 Pa.Commonwealth Ct. 99, 455 A.2d 731 (1983).

In construing the Act, the narrowest technical accounting connotation which this court has ever expressed was as follows:

We are convinced that when the Legislature used the word 'account' in the definition of a public record it intended that word to have the meaning of a record of debit and credit entries to cover transactions during a fiscal period of

time and did not intend the word 'account' to mean a statement of facts or events.

*Butera v. Commonwealth,* 29 Pa.Commonwealth Ct. 343, 346, 370 A.2d 1248, 1249 (1977).

■ Thus this court confirmed rejection of the narrative sense of "account," but we did not confine the meaning of account to an isolated debit or credit. Instead, that opinion embraces a "record" of such entries "to cover transactions during a fiscal period of time...." And each Report in this case is precisely that.

In some cases, involving statistical data or administrative reports, this court has based its allowance of public access upon the existence of such data as a basis for agency decision-making rather than upon describing those data as accounts or accountings. *Pennsylvania Association v. Department of Education,* 91 Pa.Commonwealth Ct. 531, 498 A.2d 16 (1985); *Patients of Philadelphia State Hospital v. Department of Public Welfare,* 53 Pa.Commonwealth Ct. 126, 417 A.2d 805 (1980).

Of course, that principle—that the foundations of bureaucratic decision-making should be open to the public—soundly contradicts DPW's contention here that these Reports should *not* be public because they are for management purposes, i.e., decision-making.

Thus, in the final analysis we see that the dichotomy expressed by DPW before the remand was not a valid one. The relationship between (1) an account dealing with the disbursement of funds, and (2) an accounting of disbursements assembled for the purpose of internal management is not mutually exclusive. Both of those classes of information involve accounting for public funds and hence can be, and are, public records open to the citizenry which provides those funds.

Indeed, public examination of an isolated debit or credit entry will yield little or no enlightenment to anyone other than the particular individual to whom it pertains, but a compiled accounting of a large series of transactions can well apprise

the public as to how the public's servants are performing. And that obviously is one important purpose of the Right-to-Know Act.

Public agency management data should be open to top management—the public.

## CONCLUSION

The Act implements, with the specificity recited above, the broad concept that the citizens of the Commonwealth are entitled to have access to records dealing with public funds.

The action of DPW must be reversed and an order issued to allow petitioner Sipe to copy the requested records in accordance with reasonable rules as authorized by § 3 of the Act.

## *ORDER*

NOW, April 6, 1994, it is ORDERED that the refusal actions of the Department of Public Welfare (DPW), dated June 23, 1992, and July 13, 1992, and August 17, 1992, are reversed, and DPW is directed to provide to petitioner an opportunity to copy nursing home Settlement and Appeal Activity Reports for the monthly periods of July, 1989 through June, 1992, inclusive.

PELLEGRINI, J., filed dissenting opinion in which SMITH, J., joined.

PELLEGRINI, Judge, dissenting.

I respectfully dissent. The majority holds that monthly summaries of certain financial information compiled for the Department of Public Welfare's (Department) management monitoring and internal budgeting purposes (Report) is a public record as defined by the Right-to-Know Act because it is an "account ... dealing with the disbursement of funds." In reaching this holding, the majority relies on public policy considerations not supported by the language of the Act or our case law.

Randall Sipe (Sipe) requested the Department to make the monthly Reports available to him for inspection pursuant to the Pennsylvania Right-to-Know Act (Act), Act of June 21, 1957, P.L. 390, *as amended,* 65 P.S. §§ 66.1–66.4. The Department denied the request. Sipe appealed to this court contending that because the Reports contained financial information, they are "accounts" and subject to disclosure as public records as they deal with the disbursement of public funds pursuant to Section 1(2) of the Act, 65 P.S. § 66.1(2). Section 1(2) of the Right-to-Know Act defines a "public record" as:

> Any *account, voucher or contract dealing with the receipt or disbursement of funds by an agency* or its acquisition, use or disposal of services or of supplies, materials, equipment, or other property and any minute, order or decision by an agency fixing the personal or property rights, privileges, immunities, duties or obligations of any person or group of persons.... (Emphasis added.)

The majority agrees and holds that any reports used for budgeting purposes, and as a means to monitor the productivity of the responsible personnel, are subject to disclosure as a public record. According to the majority, an "account" includes reports generated from data contained in the original record of a disbursement or receipt of funds by an agency. I believe the majority's interpretation of the meaning of the term "account" as contained in the definition of a public record is at variance with how a "public record" is defined in the Act.

The Pennsylvania Public Right-to-Know Act is not as expansive as some states and certainly not as expansive as the federal Freedom of Information Act (5 U.S.C. § 552). *See The Morning Call, Inc. v. Lower Saucon Township,* 156 Pa.Commonwealth Ct. 397, 627 A.2d 297, 299, fn. 10 (1993). The Act defines as a public record "any account ... dealing with the disbursement of funds"; unlike other jurisdictions, it does not define public records as summaries of accounts or information about accounts, but only provides that the "accounts" are public records and nothing more. If the General Assembly wanted summaries of accounts or reports of accounts used internally to monitor activity to be available for

public inspection, it knew how to say it, other jurisdictions did.[1]

Contrary to what the majority's opinion suggests, this court has only construed the definition of "account" to include the actual payment documents and not the summaries of budget information. In *Butera v. Commonwealth of Pennsylvania, Office of the Budget*, 29 Pa.Commonwealth Ct. 343, 370 A.2d 1248 (1977), a case directly on point, we held that budget reports that included summaries of accounts submitted by the various departments to the Secretary of the Budget, with

1. In *Lower Saucon Township*, 156 Pa.Commonwealth Ct. at 402, 627 A.2d at 299–300, fn. 10, we set forth the definition of "public record" in a number of different states "Right-to-Know" Acts. As defined in those states, "public record" is defined as:

| State | State Statute |
| --- | --- |
| Alaska | Unless specifically provided otherwise, the books, records, papers, files, accounts, writings and transactions of all agencies and departments are public records and are open to inspection by the public under reasonable rules during regular office hours.... [Alaska Public Records Act § 09.25.110] |
| Maine | The term "public record" means any written, printed or graphic matter or any mechanical or electronic data compilation from which information can be obtained, directly or after translation, into a form susceptible of visual or aural comprehension, that is in the possession or custody of an agency or public official of this State or any of its political subdivisions, ... of any of these entities, and has been received or prepared for use in connection with the transaction of public or governmental business or contains information relating to the transaction of public or governmental business, except: [Maine Freedom of Access Act, M.R.S.A. § 402(3)] |
| West Virginia | "Public record" includes any writing containing information relating to the conduct of the public's business, prepared, owned and retained by a public body. [West Virginia Freedom of Information Act § 29B-1-2] |
| Louisiana | All books, records, writings, accounts, letters ... having been used, being in use or prepared, possessed or retained for use in the conduct, transaction or performance of any business, transaction, |

necessary information to enable the Secretary to prepare the state budget, were not "accounts" within the definition of the Right-to-Know Act. We found the Legislature intended "account" to have a limited meaning, stating:

> We are convinced that when the Legislature used the word "account" in the definition of a public record, it intended that word to have the meaning of *a record of debit and credit entries to cover transactions during a fiscal period of time and did not intend the word "account" to mean a statement of facts or events.* Whether the reports required to be provided to the Budget Secretary are public records appears to be a question of first impression. However, we view them as providing a more realistic State budget, rather than being accounts to him by agencies relative to the receipt or disbursement of funds or the use of services, materials, equipment or other property. *General listings of revenues and expenditures, as set forth in the reports here, are neither accounts nor vouchers nor contracts.* (Emphasis added.)

*Id.* at 346, 370 A.2d at 1249. We limited the term "account" to those records documenting the "receipt or disbursement of funds or the use of services, materials, equipment or other property." *Id.* In other words, an "account" documents a fund from which monies are disbursed or received. The Report being sought by Sipe is certainly not an "account"; i.e., not a debit or credit, but a "general listing of revenue and expenditures", a "statement of facts or events" by which the Department monitors performance.

Moreover, the cases on which the majority relies do not support its holding. The majority erroneously relies on *Carbondale Township v. Murray,* 64 Pa.Commonwealth Ct. 465, 440 A.2d 1273 (1982), to support its expansion of the meaning of "account". In *Carbondale,* we held that "account" included a record of business dealings between parties and that cancelled checks were such a record and subject to disclosure under the Act. However, in that case, the actual cancelled checks were sought and not a report generated from data contained in these checks. Conversely, here, Sipe seeks not

the original records, but a report compiled by the Department from data contained in the audit of provider "accounts". Likewise, the majority misapplies *Anders v. Department of Treasury,* 137 Pa.Commonwealth Ct. 111, 585 A.2d 568 (1991). In *Anders,* we held that a list of uncashed, unclaimed checks held by the Treasury Department did not fall within any of the Act's exceptions and was subject to disclosure. That list, however, was compiled in order to facilitate disbursement of funds to the payees, unlike here, where the list was used only for internal purposes and neither generated receipts or caused disbursements. *See also Hoffman v. Pennsylvania Game Commission,* 71 Pa.Commonwealth Ct. 99, 455 A.2d 731 (1983) (holding the subscription list sought was an account identifying the contract between the commission and its subscribers regarding either the distribution of services or property); *Kanzelmeyer v. Eger,* 16 Pa.Commonwealth Ct. 495, 329 A.2d 307 (1974) (holding school employees' attendance records were public records because, depending on whether the absences were excused, public funds would be disbursed).

The other cases relied on by the majority are also inapplicable. Those cases held that the lists or material in question were subject to disclosure as an "order or decision by an agency fixing personal or property rights...." *See Vartan v. Department of General Services,* 121 Pa.Commonwealth Ct. 470, 550 A.2d 1375 (1988) (record of bidders a public record); *Young v. Armstrong School District,* 21 Pa.Commonwealth Ct. 203, 344 A.2d 738 (1975) (list of names of school children a public record); *Friedman v. Fumo,* 9 Pa.Commonwealth Ct. 609, 309 A.2d 75 (1973) (list of persons taking the Certified Public Accountancy exam a public record). The determinative factor in these cases was that the information sought was either "the basis for ... or an essential component of" an agency decision. The Reports generated in this case were neither; rather, they more closely resemble the "[g]eneral listings of revenue and expenditures" and are used only for internal budgeting and productivity purposes. They are of a type that we found were non-disclosable in *Butera.*

The real basis for the majority's holding is not contained in the case law and certainly not in the language of the statute as written, but in broader policy goals expressed as follows:

[The] principle—that the foundations of bureaucratic decision-making should be open to the public—soundly contradicts DPW's contention that these reports should *not* be public because they are for management purposes, i.e., decision-making.

Thus, in the final analysis, we see that the dichotomy expressed by DPW ... [is] not a valid one. The relationship between (1) an account dealing with the disbursement of funds, and (2) an accounting of disbursements assembled for the purpose of internal management is not mutually exclusive. Both of those classes of information involve accounting for public funds and, hence, can be and are public records open to the citizenry which provides those funds.

Indeed, public examination of an isolated debit and credit entry will yield little or no enlightenment to anyone other than the particular individual to whom it pertains, but a compiled accounting of a large series of transactions can well apprise the public as to how public servants are performing, and that obviously is one important purpose of the Right-to-Know Act.

Public agency management data should be open to the top management—the public. (Emphasis added.)

Opinion, p. 1382.

While much recommends the policy considerations set forth in the above-quoted language, the public—who speaks through the General Assembly—has not chosen to be so expansive in defining "public record". In choosing its words, the General Assembly only said "accounts" are public records; it did not say that "information involved in accounting" nor "compiled accounts" are public records. The majority ignores the issue before us—the definition of what is an "account"—and takes a quantum leap to redefine the definition of "public record" to include "public agency management data." While the Report

is certainly "public management agency data", nothing in the language of the Act or the case law even suggests such a result.

I am sure that when the Right-to-Know Act was enacted, there were those that proposed a much more expansive definition of what are considered public records but were unsuccessful. We are obliged to interpret Acts of the Assembly as written, not as we may wish they were written. As written, an "account" is the record of disbursements and credits, not documents containing information about accounts, not summaries of accounts and not "public management agency data". I respectfully dissent.

SMITH, J., joins in this dissent.